IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| LLOYD HOUSLEY<br><br>Plaintiff,<br><br>v.<br><br>ORTECK INTERNATIONAL, INC.,<br><br>Defendant. | Law No. 4:05-cv-531<br><br>**ORTECK INTERNATIONAL, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE EXPERT TESTIMONY OF CRAIG J. KRAPFL** |

**MEMORANDUM OF LAW IN SUPPORT OF ORTECK INTERNATIONAL, INC.'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF CRAIG J. KRAPFL**

**SUBJECT MATTER TABLE OF CONTENTS PURSUANT TO LOCAL RULE 7.1(i)**


I. INTRODUCTION ..... 2

II. BACKGROUND ..... 2

III. THE *DAUBERT* STANDARD ..... 3

IV. ARGUMENT ..... 5

A. Plaintiff's "Expert" Craig Krapfl ..... 5

1. Mr. Krapfl is an Insurance Adjuster, and Not an Expert in Tire Failure Analysis ..... 5

2. Mr. Krapfl Lacks Even a Basic Understanding of Tire Evaluation Techniques or Tire Components ..... 7

B. Mr. Krapfl's Opinions Are Not Based on a Relevant Methodology and Clearly Lack Reliability ..... 9

1. Mr. Krapfl's Opinion Regarding the Cause of the Accident is Based Upon Nothing More Than an Assumption ....................10

2. Mr. Krapfl Offers No Opinion Regarding the Adequacy of the Warnings in This Case....................13

V. CONCLUSION....................14

## I. INTRODUCTION

Plaintiff in this product liability case has decided to insert an insurance adjuster into the role of a forensic tire expert. However, the adjuster's deposition testimony plainly reveals that his proposed testimony does not and cannot satisfy *Daubert*, and should therefore be excluded.

## II. BACKGROUND

This product liability case arises out of an accident that occurred on September 25, 2003 in Corydon, IA. Earlier that day, plaintiff purchased a tire, specifically an Indus 11.00-16 8-ply tire ("subject tire"), from American Tire Distributors, Inc., of Des Moines, IA. While plaintiff was mounting and inflating the tire on a tractor rim for his customer, Ronald Wilson, the tire "exploded" and caused injury to the plaintiff. Mr. Craig J. Krapfl, an insurance adjuster, was retained by Universal Underwriters Group ("Universal") on behalf of the seller of the subject tire, American Tire Distributors, Inc., for the purpose of inspecting the subject tire and investigating the accident. After inspecting the tire, Mr. Krapfl noted in a standard adjuster's report dated April 8, 2005 to Universal that he believed the tire bead was split and that he further believed this split was likely the cause of the accident. However, he was unable to determine what caused the bead split and recommended further testing:

> In this adjuster's review of the tire it is obvious that there is a break in the bead on one side of the tire. We have examined the outside and inside walls of the tire and found no defects to the tire. However, upon examining the bead, there appears to be a separation or a split in the bead. . . . We believe that this split in the bead is the cause for the tire explosion. At this time we can not

> determine why this split is present. . . . We believe that additional testing could be done to determine why this bead has broken.

(April 8, 2005 Report of Craig J. Krapfl, attached as Exhibit A, at p.2.) On May 25, 2006, plaintiff named Mr. Krapfl as a retained expert in this case. Because the plaintiff has never cited to or disclosed any "expert report" by Mr. Krapfl as required under federal and local rules, the only logical explanation is that he intends to rely on Mr. Krapfl's April 8, 2005 report. Orteck deposed Mr. Krapfl on September 6, 2006. In his deposition, for the first time, Mr. Krapfl speculated that the bead split had some unspecified relationship to the tire manufacturing process, however, when pressed, he admitted that this "opinion" was based only upon his own assumptions. (*See* Deposition of Craig J. Krapfl, attached as Exhibit B, at pp.84-85.)

Apparently, plaintiff decided to retain Mr. Krapfl, the insurance adjuster originally hired by Universal Underwriters Group to adjust the accident, as a tire expert to opine on accident causation. Because Mr. Krapfl's conclusions, findings, and opinions clearly do not meet the requirements of Federal Rule of Evidence 702 and *Daubert* for the admissibility of tire failure/causation testimony, his testimony should be excluded.[1]

## III. THE *DAUBERT* STANDARD

The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), emphasized that Federal Rule of Evidence 702 requires trial courts to serve as evidentiary "gatekeepers" who must conscientiously screen expert testimony for relevance and reliability. This requires that the court ensure that such testimony constitutes "good science," and that findings are sufficiently "derived by the scientific method" or otherwise "supported by appropriate validation." *Daubert*, 509 U.S. at 590, 593. In the subsequent decision of *Kumho*

[1] Orteck has designated a forensic tire expert in this case, Thomas Dotson, who can explain, unlike Krapfl, (a) whether the bead is broken, (b) why it is broken, and (c) whether any break in the bead happened before or after the accident. The point of this motion is that Krapfl is not qualified to offer testimony on any of these points.

*Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court abolished the distinction between scientific and technical evidence previously recognized by some courts and held that the opinions of a tire expert merited Rule 702 scrutiny. *Kumho* involved analysis of issues similar to those involved in this case, upholding a trial court's decision under *Daubert* to exclude a tire failure analyst's expert testimony that a particular tire failed due to a manufacturing or design defect. *Id.*

In assessing the validity of an expert theory or technique, the Supreme Court in *Daubert* and *Kumho* set forth a non-exclusive four factor test to be used in evaluating whether such testimony is “reliable” and “relevant,” including: “(1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; (4) whether the theory or technique is generally accepted in the scientific community." *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 776-77 (8th Cir. 2004) (citing *Daubert*, 509 U.S. at 590). These four factors are the primary means of evaluating scientific, technical and engineering opinions.

In essence, a court must inquire into whether proposed expert testimony is both reliable and relevant. *See Wagner v. Hesston Corp.*, 450 F.3d 756, 758 (8th Cir. 2006). Nevertheless, an expert’s opinion must not include unsupported speculation and subjective beliefs. *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006) ("Expert testimony is inadmissible if it is speculative . . . .").

## IV. ARGUMENT

### A. Plaintiff's "Expert" Craig Krapfl

Here, Mr. Krapfl clearly lacks the requisite training, experience, education, or other credentials to qualify as a forensic tire expert under *Daubert.* Courts in the Eighth Circuit require that the proposed expert have formal training or, at a minimum, some practical knowledge or experience that would provide them with the requisite expertise in the area on which he or she is called on to testify. *Garnac Grain Co., Inc. v. Blackley*, 932 F.2d 1563, 1566 (8th Cir. 1991) (excluding testimony of two proposed experts with limited formal training and no practical knowledge concerning the area on which they were called to testify); *see also Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 282-84 (8th Cir. 1995) (noting in dicta that proposed tire expert with no professional experience in tire manufacture or tire failure analysis would most likely not qualify as tire expert).

Mr. Krapfl is an insurance adjuster, not a forensic tire expert or failure/causation expert. He holds no technical degrees or specialized training in tire failure. Moreover, he has never been retained as an expert in any other matter, much less one involving tire failure analysis. For all these reasons, Mr. Krapfl's testimony fails to meet the *Daubert* standard for admissibility and should be excluded.

#### 1. Mr. Krapfl is an Insurance Adjuster, and Not an Expert in Tire Failure Analysis

Mr. Krapfl is an insurance adjuster in Iowa, and not a forensic tire expert. (Exhibit B, at p.5.) He holds a bachelors degree in economics that he received from the University of Iowa, and does not have a graduate degree in any field. (*Id.* at pp.26-27.) Moreover, Mr. Krapfl does not have a degree or any formal training in any field related to tire analysis or design. (*Id.* at

p.26.) Similarly, Mr. Krapfl has no certifications in any technical field related to tires, has never taken any formal technical courses related to tires, and is not an engineer. (*Id.* at p.56.)

His job as an insurance adjuster is not to determine the cause of an accident through his own analysis, but to rely upon others, such as witnesses, investigating officer's reports, or even cause-and-origin experts, which he sometimes assists clients in retaining:

> Q. When you go out to -- as an example, to a property that has been damaged as a result of fire, is it your job as the adjuster to determine what caused the fire or merely that the fire caused the loss?
>
> A. A little bit of both. In some cases it's obvious what caused the fire, that I can report to the company and say, you know, [t]his is what we believe caused the fire. This is why we believe this, based on a witness was here, saw this fire happen because of this, or, the fire department was here. Here's the fire report. If it is something a little more complex, we can talk to the company about utilizing a cause-and-origin expert. And then from there, does that company have a cause-and-origin expert, do they have someone in this area that they prefer to use or do they want us to help them locate a cause-and-origin expert, and at that point we bring them in. Their job at that point, why did this thing burn, what caused it to burn. My role would shift more to adjusting the damage side of the loss.
>
> Q. Have you, in fact, helped your clients, which are typically insurance companies --
>
> A. Yes.
>
> Q. -- to locate and retain a fire cause-and-origin expert?
>
> A. Yes, I have, in the past.

(*Id.* at pp.11-12.)

Given this, it is not surprising that until this case, Mr. Krapfl has never offered any opinions regarding a tire. (*Id.* at p.57.) He has never been retained as an expert in any case, much less a case involving tire analysis. (*Id.* at p.56.) In fact, he has never even adjusted an accident similar to the present situation in his role as an adjuster:

Q. Have you adjusted any losses arising out of what I will call a "tire servicing" accident where someone was in a tire shop, a garage, a Goodyear store, and was mounting a tire on a rim and there was an accident as a result of that and the service person was hurt?

A. This, I believe, would be the first one I had where someone was injured on a tire.

(*Id.* at p.13.)

Mr. Krapfl clearly lacks the experience necessary to give expert testimony under the *Daubert* standard. In his professional duties as a tire adjuster, at no time does he conduct his own in-depth analysis to determine causation. Instead, he relies upon others to determine causation. Moreover, he has no experience with giving opinions as a forensic tire expert, and for that matter, has no experience with giving expert testimony whatsoever. Therefore, given Mr. Krapfl's clear lack of experience, he is properly excluded from testifying as an expert under the *Daubert* standard.

**2. Mr. Krapfl Lacks Even a Basic Understanding of Tire Evaluation Techniques or Tire Components**

Mr. Krapfl was unable to identify any written materials regarding tire evaluation that are considered authoritative by the tire industry. (*Id.* at p.61.) He was unable to identify the Federal Motor Vehicle Safety Standards or Society of Automotive Engineers Standards that apply to tires, or any other tire industry standards. (*Id.* at pp.61-62.)

He has never been a member of any engineering or tire-related organization or society, nor has he ever attended any industry technical meetings of any kind regarding the tire field. (*Id.* at p.56.) He has never reviewed a report from anyone claiming to be a forensic tire expert explaining why a tire failed or did not work the way it should. (*Id.* at p.22.) In addition, he has never witnessed forensic tire analysis or a failure analysis inspection. (*Id.* at p.27.) Not surprisingly, no court or official body has ever recognized him as a tire expert. (*Id.* at p.57.)

In addition, Mr. Krapfl only possesses a rudimentary understanding of the subject tire's components, particularly the bead, which are the subject of his opinions in this case:

> Q. Do you know what the tire bead is, by the way?
> A. It's the lip of the tire that goes under the rim.
>
> Q. Do you know what is inside that part of the rubber[?]
>
> * * *
>
> A. If I understand, it's like a continuous metal strand that supports that bead.
>
> Q. Where do you get that understanding from?
> A. I've never seen one. I've actually -- how do I know there's a piece of metal in there?
>
> Q. Is that from when you were changing tires or do how do you know that?
> A. Partially that. I know that from just getting tires worked on on my personal car, you know, the tire guy mentioned there's a piece of metal in there, things like that. Nowhere that I can remember I probably know it's there.
>
> Q. Do you know anything about the configuration of the bead or the piece of metal, if you will, that was in this particular tire, what its dimensions are, what its tensile strength is?
> A. No, sir.
>
> Q. How many times it was wound?
> A. No, sir.
>
> Q. Have you seen any documents or asked for any documents that might give that information?
> A. No, sir.

(*Id.* at p.46.)

It is rather clear that Mr. Krapfl never really went beyond his adjuster role in this case. His report urges that the tire be x-rayed or otherwise analyzed to determine more information about the split bead. He readily acknowledged his limitations regarding analysis when asked whether he would be qualified to render opinions about a tire based on an x-ray or "cutaway":

Q: Even if we were to cut the tire open or to x-ray it, would you feel comfortable in coming to a conclusion about why the bead was broken or would that be something for a metallurgical expert or someone else?
A: I believe a metallurgist, yeah, or someone in tire manufacturing.
Q: Right. . . . I know we have talked about you don't have any background in tire manufacturing and design; you do in tire changing, but you don't have any metallurgical background.
A: Oh, no, sir.

(*Id.* at p.87.)

In sum, Mr. Krapfl is clearly not qualified to testify as an expert given his clear lack of knowledge or familiarity with tire analysis or components. He lacks a basic understanding of even the most elementary of industry-wide tire standards. In addition, he has admitted his own inadequacies regarding tire analysis or evaluation. Any opinion testimony Mr. Krapfl offered is therefore properly excluded under *Daubert*.

**B. Mr. Krapfl's Opinions Are Not Based on a Relevant Methodology and Clearly Lack Reliability**

Even assuming Mr. Krapfl is qualified to give expert testimony, which he clearly is not, he exhibited no discernible methodology or foundation when formulating his opinions. Therefore, Mr. Krapfl's opinions are tainted with the speculation and subjective beliefs that *Daubert* sought to avoid. *See Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006) ("Expert testimony is inadmissible if it is speculative . . . ."); *Dairy Farmers of Am. v. Travelers Ins. Co.*, 391 F.3d 936, 943 (8th Cir. 2004) (affirming the exclusion of an expert whose "proffered opinion lacked foundation and was purely speculative"). When determining whether an expert's testimony is admissible, "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (internal quotation and citation omitted). Thus, the court, in its capacity

as gatekeeper, must "separate[] expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001). Courts have consistently recognized that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *See, e.g., J.B. Hunt Transp., Inc. v. Gen. Motors Corp.*, 243 F.3d 441, 444 (8th Cir. 2001) (internal quotation omitted). Courts are free to exclude evidence when they find that "there is simply too great of an analytical gap between the data and the opinion proffered." *Id.*

**1. Mr. Krapfl's Opinion Regarding the Cause of the Accident Is Based Upon Nothing More Than an Assumption**

Mr. Krapfl opined in his report that a split in the bead of the tire was likely the cause of the alleged accident:

> In this adjuster's review of the tire it is obvious that there is a break in the bead on one side of the tire. We have examined the outside and inside walls of the tire and found no defects to the tire. However, upon examining the bead, there appears to be a separation or a split in the bead. We have provided several photographs that show this adjuster pulling forward on the bead showing that the bead and the tire edge will bend. . . . We believe that this split in the bead is the cause for the tire explosion.

(Exhibit A, at p.2.)

Nonetheless, Mr. Krapfl freely admitted that he did not follow any type of recognized inspection procedure or methodology when devising this opinion:

> Q: In following the process that you did to inspect the tire and record your observations, you were not following or relying on any tire expert or forensic tire inspection procedure or methodology in particular, were you?
> A: No that I'm aware of, no.
>
> Q: You were just relying on your own experiences as an adjuster and things like this?

A: Yes.

Q: In giving your testimony in this case, are you relying on any community of tire experts saying, "well, they do it a certain way, so that's what I'm doing here"?
A: No. As far as the photographing and doing what I did? No.

Q: And then giving your opinions?
A: No.

(Exhibit B, at p.76.)

Perhaps realizing the inadequacy of his own inspection methods, Mr. Krapfl further elaborated in his report that "[a]t this time we can not determine why this split is present." (Exhibit A, at p.2.) Mr. Krapfl went on to suggest that "additional testing could be done to determine why this bead has broken." (*Id.* at p.2.) Curiously, he then contradicted his earlier opinion that the bead was split, and further suggested the tire be "x-rayed to see if the metal bead is broken and determine why this metal bead has split." (*Id.* at p.2.) (emphasis added). He changed direction again in his deposition, claimed that the bead had split, and suggested that the split was likely the result of something in the manufacturing process of the tire:

Q. Can you tell us today why the bead split?
A. No, I can't.

Q. You have no opinion on that?
A. I think possibly it was more during the manufacturing of it because, like I said, my idea when I inspected the tire was to look for something related to the installation, whether it be a gauge [sic] or some type of marking that Mr. Housley or one of his employees did or may have damaged it during the installation process, and I could not find that.

(Exhibit B, at p.71.) Mr. Krapfl's about-face on the cause of the bead split, however, was not based upon any scientific or technical basis, but instead on Mr. Krapfl's groundless assumptions:

Q: So what you are saying is since you couldn't find any evidence of what you would consider to be evidence of

improper installation and since **you also were assuming** that the bead was split there, **you are assuming** that it was maybe something in the manufacturing process?
A: Yes.

Q: Can you tell me what part of the manufacturing process you think that occurred in?
A: No I cannot.

* * *

Q: Is it fair to say then that you are really just making an assumption that the bead was damaged in the manufacturing process?
A. I think, yeah.

Q. It's an assumption really without any scientific or technical basis; correct?
A. Correct.

(*Id.* at p.72. (emphasis added))

Despite his apparent indictment of the manufacturing process of the tire as the culprit for the alleged bead split, Mr. Krapfl stated he has no problem with the manufacturing process:

Q: You do not have any criticisms of the design or the manufacture of the tire, do you?
A: Not that I'm aware of, no.

Q: Are you still open to the possibility that something other than a manufacturing problem caused the bead to be in the condition it was when you saw it?
A: If something could be showed to me that would state that, yes.

(*Id.* at p.98.)

Mr. Krapfl admitted that he relied on no recognized scientific methodology while inspecting the subject tire. He also admitted to relying on his own assumptions, rather than scientific facts, in formulating his opinions. The Court need look no further than the apparent confusion of Mr. Krapfl himself, who at various times opined that he did not know why the bead

split, that the bead split was likely the result of a problem in the manufacturing process, and that he had no issue with the manufacturing process of the tire. Opinions of this nature, unsupported by fact or methodology, and that flip-and-flop to the point that even Mr. Krapfl is unsure exactly what he means, are properly excluded under *Daubert*.

**2. Mr. Krapfl Offers No Opinion Regarding the Adequacy of the Warnings in This Case**

In his April 8, 2005 investigation summary, Mr. Krapfl expressed no opinion that any warning or instruction given with the subject tire was inadequate. (See Exhibit A, at p.2) In addition, when confronted with a question regarding the adequacies of the warnings given, Mr. Krapfl gave no opinion, and at the most seemed satisfied with the warnings that were given:

> Q. At the top of page 2, we were talking about the information, the safety warning that you recorded right off the side of the tire. I take it you don't have any opinion or testimony that you are going to offer about whether that is an appropriate piece of information or an inappropriate piece of information to put on a tire, do you?
> A. I would assume that had been proven that they should follow those directions. It says 40 psi, use 40.
>
> Q. In other words, you are not critical of that?
> A. No.

(See Exhibit B, at pp.84-85.)

Since Mr. Krapfl has offered no opinion regarding the adequacy of the warnings or instructions given Mr. Housley, his testimony is of no use to the jury regarding these issues. Instead, his testimony as an expert on these issues would only confuse the jury, and create the illusion that problems exist with the warnings and instructions given in this case. Therefore, because Mr. Krapfl's testimony on this issue would only create confusion, he is properly excluded under the *Daubert* standard.

## V. CONCLUSION

Mr. Krapfl's opinions clearly fail to meet the *Daubert* requirements. He is an insurance adjuster by profession. As such, he lacks the experience to qualify as an expert in tire failure analysis. In addition, he lacks the necessary education, specialized training, and knowledge to render any opinion as to the cause of the bead split in the tire. Moreover, his opinions are not based upon any recognized methodology, nor are they reliable or relevant. He offers no sound opinion as to why the accident occurred, and in addition, he offers no opinion as to the adequacy of the warnings or instructions given in this case. Simply put, Mr. Krapfl's retention as an expert is nothing more than a poorly veiled attempt by plaintiff to substitute lay person testimony for expert witness testimony.

For the foregoing reasons, the Court should grant Orteck's motion to exclude the testimony of Craig F. Krapfl.

By [signature]
One of Its Attorneys

Brent B. ("Chris") Green (AT002931)
Bradley C. Obermeier (AT0005879)
Duncan Green Brown & Langeness
400 Locust Street
Suite 380
Des Moines, Iowa 50309
(515)-288-6440 (telephone)
(515)-288-6448 (fax)
bgreen@duncangreenlaw.com
bobermeier@duncangreenlaw.com

Thomas R. Woodrow
Holland & Knight LLP
131 S. Dearborn St., 30th Floor
Chicago, IL 60603
(312)-263-3600 (telephone)
(312)-578-6666 (fax)
tom.woodrow@hklaw.com

ATTORNEYS FOR DEFENDANT
ORTECK INTERNATIONAL, INC.

Copy to:

James Sayre
James L. Sayre, P.C.
13375 University Avenue, Suite 101
Clive, IA 50325

ATTORNEY FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2006, I electronically filed the foregoing Orteck International Inc's memorandum of law in support of its motion to exclude the expert testimony of Craig J. Krapfl with the Clerk of the Court using the CM/ECF system that will send notification of such filing to the following:

James Sayre
James L. Sayre, P.C.
13375 University Avenue, Suite 101
Clive, IA 50325
**Attorney for Plaintiff**